CANBY, Circuit Judge:
 

 Greenamyer Engineering and Technology, Inc. (“GE & T”) appeals a decision of the Bankruptcy Appellate Panel holding that certain contracts executed by Medis-can Research, Ltd. (“Mediscan”) and GE & T are unenforceable due to common law fraud, violation of the United States securities laws, lack of consideration, and impossibility of performance. In so ruling, the Bankruptcy Appellate Panel upheld the pivotal factual findings of the bankruptcy court, whose decision it affirmed. GE & T presents various challenges to the four grounds relied upon by the bankruptcy courts. We reject these challenges and affirm.
 

 BACKGROUND
 

 In 1981, GE & T sought monetary backing for the development of a device for monitoring body temperature and pulse. Ed Hubert, an attorney and accountant, introduced the officers of GE & T to the officers of American Principals Corporation (“APC”). To raise funds for the project, the parties published a Private Placement
 
 *560
 
 Memorandum (PPM) in which APC, as general partner, offered for sale 35 limited partnership units in Mediscan. The partnership interests were priced at $140,500 per unit, for a total investment of $4,917,-500. The PPM included an agreement entitled Research and Development Agreement (hereinafter “Draft Agreement”) which was to be executed by GE & T and Medis-can after the offering was fully subscribed. According to the Draft Agreement, GE & T was to be paid $4,153,000 for its research and development services, and that entire amount was to qualify as research and experimental expenditures within the meaning of section 174 of the Internal Revenue Code. The Draft Agreement also contained a “no verbal agreements” clause, providing that the agreement could be amended only in writing. The PPM further specified that the subscription proceeds would be deposited in an escrow account. If all 35 units were not sold by December 31, 1981, all proceeds of sale would be returned to the limited partners and the offering would be terminated.
 

 On December 31, 1981, Mr. Greenamyer, the president of GE & T, and Mr. Clinton, the vice-president, met with Mr. Hubert and the officers of APC. At the meeting, Hubert announced that only 13.5 units of Mediscan had been sold and advised APC to inform the limited partners that the offering had not been fully subscribed by the date specified in the PPM. Instead, GE & T and APC executed an agreement (“the Agreement”) which obligated Mediscan to pay GE & T $1,601,871 to develop the technology. The amount equaled the funds then available from the sale of the 13.5 units. Except for the change in price, the Agreement was the same as the Draft Agreement contained in the Private Placement Memorandum. The parties also signed a letter agreement, dated December 31, 1981, purportedly modifying the Agreement by requiring payment in the amount of $2,200,000 to GE & T for performing the research and development work for Medis-can.
 

 The decision to sign the Agreement for less money was made as a result of conversations between Mr. Greenamyer and Mr. Zimmerman, the chief executive officer of APC. Greenamyer and Zimmerman made an oral agreement that APC would guarantee payments to GE & T up to $2,200,000, regardless of whether any additional units of Mediscan were sold. According to Greenamyer, APC also agreed that GE & T would be obligated to perform development services only to the extent of the available funds and that GE & T would receive the full $4,153,000 when the partnership units were fully subscribed and the funds available. None of these written and oral agreements were disclosed to the Mediscan investors.
 

 In January 1982, APC amended the Placement Memorandum, extending the offering date to June 1982, with an option to extend the date further to December 1982. The remaining partnership units were eventually sold in 1982.
 

 In November 1982, after all of the partnership interests were sold, GE & T and APC executed a First Amendment to the Agreement (“Amended Agreement”). The Amended Agreement differed from the Agreement only in the amount of compensation Mediscan was obligated to pay GE & T for the development of the technology. The amendment increased Mediscan’s obligation to GE & T to $4,153,000, the amount originally provided for in the Draft Agreement.
 

 On June 9, 1983, APC executed a promissory note (“Promissory Note”), providing for payments to GE & T in the total sum of $1,953,000 by December 31, 1988. The Promissory Note itself, however, provided for six payments of $193,500 and acknowledged one past payment of $140,000, for a total of only $1,301,000. The Promissory Note was thus inconsistent with the proposed Draft Agreement and was also self-contradictory on its face. The limited partners were not informed of the Amended Agreement or the Promissory Note.
 

 In 1985, the IRS audited Mediscan. The IRS determined that GE & T had virtually completed the research and development, and prohibited Mediscan from taking any further tax deductions for payments to GE
 
 *561
 
 & T for research and development work. At that point, GE & T had received payment from Mediscan in the amount of $2,204,003.
 

 The Mediscan limited partners first learned of possible fraud and securities violations within the partnership in May 1985.
 
 [1]
 
 Eight months later, in January 1986, Medis-can filed a petition for relief under Chapter 11 of the Bankruptcy Code. Mediscan sought an accounting and rescission of the Amended Agreement and the Promissory Note, and restitution of moneys previously paid to GE & T under the Agreement. GE & T counterclaimed against Mediscan for sums due under the Note and Amended Agreement.
 

 The Bankruptcy Court held that Medis-can was not entitled to recover sums paid to GE & T under the Agreement, but concluded that the Promissory Note and Amended Agreement were unenforceable for common law fraud, violation of the United States securities laws, lack of consideration, and impossibility of performance. The Bankruptcy Appellate Panel affirmed. 109 B.R. 392.
 

 ANALYSIS
 
 [2]
 

 GE & T presents numerous challenges to the four grounds relied upon by the bankruptcy courts. Because we affirm on the basis of fraud, we do not address appellants’ arguments regarding the remaining three grounds.
 

 A. Fraud
 

 GE & T argues that the evidence was insufficient to support the court’s finding of fraud. Specifically, GE & T contends there is no evidence that: (1) GE & T or Mr. Greenamyer had knowledge of, assisted in, or was involved in APC’s failure to disclose facts to the limited partners; (2) GE & T or Mr. Greenamyer had an affirmative duty to disclose facts to the limited partners; (3) the Amended Agreement and Note were obtained by fraud; and (4) the limited partners reasonably relied upon the misrepresentations or omissions. We discuss each challenge in turn.
 

 In holding that the Note and Amended Agreement were voidable for fraud, the bankruptcy court found:
 

 Mr. Hubert, Mr. Greenamyer and GE & T actively participated in and assisted in defrauding and concealing the truth from Mediscan’s limited partners. Mr. Green-amyer, Mr. Hubert, GE & T and American Principals knew the offering had not been fully subscribed by December 31, 1981, and that the private placement memorandum required the investors’ payments to be returned. Rather than return the money, they prepared and signed the secret agreement so that the investors would not be refunded their money. American Principals and GE & T financially benefited from the actions they took. The Agreement, Amendment and Note were obtained through common law fraud and should be rescinded....
 

 In addition, the court found that “the failure to sell all 35 partnership units by December 31, 1981, and the oral and written revisions of the Draft Agreement with GE & T were material facts which should have been disclosed to all the Mediscan investors by American Principals, Mr. Greenamyer, GE & T, and Mr. Hubert.” The Bankruptcy Appellate Panel affirmed, holding that the court’s findings were not clearly erroneous. We conclude that there is sufficient evidence to support the bankruptcy court’s findings, and that those findings are not clearly erroneous.
 

 
 *562
 
 GE & T first argues that there is no evidence that GE & T, Mr. Greenamyer or any officer of GE & T was aware that APC failed to advise its limited partners regarding the fact that the offering was not fully subscribed or of the various amendments to the Draft Agreement contained in the Private Placement Memorandum. Moreover, GE & T asserts that there is no evidence that GE & T, Mr. Greenamyer or any officer of GE & T assisted APC in concealing these or any other matters from Mediscan’s limited partners. We disagree.
 

 The bankruptcy court found that Mr. Clinton and Mr. Greenamyer actively participated in selling the units of Mediscan to investors.
 
 [3]
 
 The bankruptcy court could infer that GE & T, as a seller of Mediscan, was aware of the terms of the PPM, including the requirement that the limited partners be reimbursed if all partnership units had not been sold by December 31, 1981. Even if GE & T, as seller, was not aware of the reimbursement requirement, GE & T was made aware at the December 31, 1981 meeting when Mr. Hubert told APC and GE & T that the limited partners should be informed that the offering had not been fully subscribed. Rather than returning the money or waiting for APC to inform the limited partners, GE & T and APC simply prepared and signed the Agreement, enabling GE & T to take advantage of the funds then available. GE & T’s willingness to enter into the Agreement, despite its knowledge that the failure to terminate the offering and return the funds to the limited partners violated the terms of the PPM, provides substantial evidence that it was aware of and assisted in concealing from the 1981 limited partners the fact that the offering was not fully subscribed by the designated date.
 

 Sufficient evidence also supports the court’s finding that GE & T was aware of and assisted in concealing the oral and written revisions of the Draft Agreement. GE & T concedes that it had reviewed the Draft Agreement contained in the PPM. As a prospective party to the contract and as a seller of the limited partnership units, GE & T was aware that the limited partners believed that Mediscan would enter into the Draft Agreement. Moreover, GE & T knew of the “no verbal agreements” clause contained in it. Nonetheless, GE & T agreed to modify the Draft Agreement, both orally and in writing, rather than return the moneys received from the partial sale. As more money came available from the sale of partnership units, GE & T and APC again amended the Agreement to recoup the available funds. The bankruptcy court accurately described the conduct of GE & T and APC as “freewheeling.” According to the court, “Whatever seems to pop into [GE & T and APC’s] minds, they seem to write, you know, new notes, new arrangements.” From this evidence, the bankruptcy court could reasonably infer that GE & T was aware of, and participated in concealing from the limited partners, the oral and written revisions of the Draft Agreement.
 

 GE & T next argues that there is no evidence of an affirmative duty on the part of GE & T or Mr. Greenamyer to disclose facts to the limited partners. According to GE & T, because there is no evidence that GE & T made any affirmative misrepresentations, the bankruptcy court’s findings of fraud must be based on concealment or nondisclosure. Since there was no confidential relationship giving rise to a duty to disclose between GE & T and the limited partners, GE & T asserts that there is insufficient evidence of constructive fraud.
 

 GE
 
 &
 
 T mischaracterizes the bankruptcy court’s holding. The court found that GE & T
 
 actively
 
 participated in and assisted in defrauding and concealing the truth from Mediscan’s limited partners.
 
 *563
 
 Thus, the fact that the officers of GE & T themselves did not make affirmative misrepresentations to the limited partners does not undermine the bankruptcy court’s finding.
 

 In California, the intentional concealment of a material fact is an alternative form of fraud equivalent to direct affirmative misrepresentation.
 
 Stevens v. Superior Court,
 
 180 Cal.App.3d 605, 608, 225 Cal.Rptr. 624, 626 (1986). The California Civil Code provides:
 

 Actual fraud, within the meaning of this Chapter, consists of any of the following acts, committed by a party to the contract, or
 
 with his connivance,
 
 with intent to deceive another party thereto, or to induce him to enter into the contract:
 

 [[Image here]]
 

 3. The suppression of that which is true, by one having knowledge or belief of the facts;
 

 4. A promise made without any intention of performing it; or,
 

 5. Any other act fitted to deceive.
 

 Cal.Civ.Code § 1572 (West 1982) (emphasis added). Under the California Civil Code, GE & T committed actual fraud by aiding APC in concealing material facts from the limited partners. Accordingly, it was not necessary for Mediscan to establish the existence of a confidential relationship.
 
 [4]
 

 GE & T next argues that there is no fraud charged or proved in connection with the formation of the Amended Agreement and Promissory Note. According to GE & T, the purported fraud was APC’s failure to disclose to its limited partners facts pertaining to the partnership business and hence relevant to their decision to purchase limited partnerships. Because there was no evidence that GE & T or Mr. Greena-myer did anything or omitted to do anything vis-a-vis the general partner that might be characterized as fraud, GE & T asserts that the Amended Agreement and Note may not be rescinded. A general partner, however, cannot bind a partnership if he has no authority to act for the partnership and the party “with whom he is dealing has knowledge of the fact that he has no such authority.” Cal.Corp.Code § 15009 (West Supp.1991).
 
 [5]
 
 The PPM entered into by APC and the limited partners provided that the limited partners would be given an opportunity to withdraw their investments if all 35 units were not sold by December 31, 1981. Because all the units were not sold by that deadline, APC had no authority to act. GE & T had knowledge of this lack of authority, and, Mediscan, therefore, is not bound by the agreement entered into by APC and GE & T.
 

 As we have discussed above, there is substantial evidence that GE & T assisted APC in defrauding the Mediscan limited partners by failing to disclose not only the fact that the offering was not fully subscribed by December 31, 1981, but also by concealing the various oral and written modifications of the Draft Agreement, including the Amended Agreement and Note.
 
 [6]
 
 Accordingly, we reject this argument.
 

 
 *564
 
 Finally, GE & T argues that the finding of fraud cannot be supported because the limited partners who purchased partnership interests in 1982 failed to show detrimental reliance.
 
 [7]
 
 According to GE & T, these limited partners presumably relied on the information contained in the PPM: that Mediscan had or would have a contract with GE & T for research and development for the sum of $4,153,000. The Amended Agreement and Note also provided that GE & T would perform $4,153,000 worth of research and development, if the funds were available. Thus, GE & T reasons, the limited partners were getting what the PPM said they would get — development of the temperature and pulse monitoring device for $4,153,000 with the only difference being in the timing of payments. According to GE & T, the 1982 limited partners failed to show that they would not have invested in Mediscan had they been aware of this one change.
 

 We disagree. GE & T concedes that, at the time the 1982 limited partners purchased their partnership units, GE & T and APC had entered into the Agreement, requiring GE & T to perform the research and development work for only $1,601,871, and the Letter Agreement, obligating APC to pay GE & T $2,200.00. GE & T also concedes that neither the Agreement, the Letter Agreement, nor the Amended Agreement, modified the duties GE & T agreed to perform, but only the compensation GE & T would receive for its work. Thus, the 1982 limited partners were misled not only as to the timing of the payments, but also as to the amount of the payments. In fact, the IRS determined that the research and development was virtually completed for the lesser contract price. Consequently, we reject GE & T’s final argument. The 1982 limited partners were not required to show that they would not have purchased partnership interests had the timing of the payments differed, but that they would not have purchased interests in Mediscan had they known that GE & T had promised to complete the same work for approximately half of the price specified in the Draft Agreement. The partners have satisfied this burden.
 

 Accordingly, the judgment of the Bankruptcy Appellate Panel is AFFIRMED.
 

 [1]
 

 . As a result of the Securities and Exchange Commission's 1984 prosecution of APC's parent company for violations of the securities law, a court appointed a receiver to oversee APC’s limited partnership. In May 1985, the receiver informed the Mediscan limited partners of apparent fraud and securities violations by APC.
 

 [2]
 

 . Mediscan asserts that we lack jurisdiction over this appeal if GE & T’s notice of appeal was not filed until August 15, 1988. Mediscan notes that the Bankruptcy Court’s docket sheet reflects that the notice of appeal was filed on August 15, 1988, whereas GE & T’s Excerpt of Record contains a copy of a handwritten notice of appeal dated August 12, 1988. Because the record shows that the notice was filed August 12, we reject Mediscan’s argument that we lack jurisdiction.
 

 [3]
 

 . Sufficient evidence supports this finding, including a letter dated July 25, 1983, from Mr. Clinton to APC. Complaining about APC’s failure timely to pay GE & T for its services, Clinton wrote:
 

 Because Mediscan was a large research and development contract and involved aggressive selling, much of which we participated in, we were tolerant of this condition until the program was fully sold out, i.e., thirty-five investors. In August, 1982, having been advised that the program was sold out....
 

 [4]
 

 .Nonetheless, we note that the record also establishes that GE & T owed a duty of disclosure to the limited partners. The
 
 Restatement
 
 provides:
 

 2. One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
 

 [[Image here]]
 

 c. Subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so.
 

 Restatement (Second) of Torts
 
 § 551(5)(c) (1977).
 
 See also
 
 Cal.Civ.Code §§ 1709 and 1710 (West 1982);
 
 Kallgren v. Steele,
 
 131 Cal.App.2d 43, 279 P.2d 1027 (1955) (concealment may constitute actionable fraud where seller knows of facts which materially affect the desirability of the property, which he knows are unknown to buyer). Thus, as a seller, GE & T had an affirmative duty to disclose to the Mediscan limited partners that the terms of the original offering had been modified.
 

 [5]
 

 . The Revised Uniform Limited Partnership Act is silent on this matter. Section 15009 of the Uniform Partnership Act, therefore, applies. Cal.Corp.Code § 15722.
 

 [6]
 

 . The general rule is that notice to any partner concerning partnership affairs operates as notice to the partnership. An exception to this rule exists “in the case of a fraud on the partner
 
 *564
 
 ship committed by or with the consent of that partner.” Cal.Corp.Code § 15012 (West 1977). Section 15012 refers to general partnerships, but because the Revised Uniform Partnership Act is silent on this issue, it applies to limited partnerships as well. Cal.Corp.Code § 15722 (West 1991). Because APC was defrauding the limited partners of Mediscan, the limited partners cannot be charged with notice.
 

 [7]
 

 . GE
 
 &
 
 T concedes that the 1981 partners can show reliance because they were not advised that the offerings were not fully subscribed by December 31, 1981. As to the 1981 partners, GE & T repeats its earlier argument that there was insufficient evidence that GE & T knew of and participated in the failure to advise. We have already addressed and rejected this argument.